NEW-YORK,
May, 1836.

Colemard
v.
Lamb.

---

### COLEMARD & KLEFFLER *vs.* LAMB.

A *guarantor* that an auctioneer shall duly account for all merchandize placed
  in his hands for sale, is *discharged from liability,* if the persons from whom
  the auctioneer received goods take his notes and give him an extended
  credit for the payment.

On a writ of error, it cannot be urged that the auctioneer *fraudulently* con-
  cealed the fact that part of his sales had been *cash sales,* although his ac-
  counts were rendered as *sales on credit,* the question not appearing to
  have been raised at the circuit.

ERROR from the superior court of the city of New-York.
Lamb was sued on a guaranty given by him in these
words: "Messrs. Colemard & Kleffler—I do hereby guar-
antee that George C. Lamb shall duly account with you for
all merchandize and proceeds of merchandize which you
may place in his hands for sale during three months from the
date hereof, and that he shall so account on demand.    I do
not, however, guarantee the payment of any notes or other
securities which may be taken by George C. Lamb in pay-

NEW-YORK, ment for said merchandize, or which may be paid over or
May, 1836. transferred by him to you. New-York, March 27, 1834." On
the strength of this guaranty, Messrs. Colemard & Kleffler
Colemard furnished George C. Lamb, who was an *auctioneer*, with goods,
v. and he from time to time rendered to them accounts of sales
Lamb. for the balances exhibited, for which they took his notes, pay-
able at *three months*, and gave him receipts for the same. They
produced in court four notes given by him, which had been
protested for non-payment, of the following sums and dates:
viz. 20th April, 1834, for $931,30; 10th May, 1834, for $1768,
74; 17th May, 1834, for $1163,39; and 26th May, 1834, for
$956,94. The course of George C. Lamb's business was,
to sell for *cash* upon all amounts under $100, and over that
sum to take notes at six months, unless the purchasers pre-
ferred to pay, in which case he made a liberal discount. On
rendering his accounts, the plaintiffs allowed a *deduction* of
three months' interest. His *cash sales* of goods furnished by
the plaintiffs amounted to $1795,71. He was in good credit
until about the middle of July, 1834, when he failed. The
presiding judge charged that the *defendant* was entitled to a
verdict, and the jury found accordingly. The plaintiffs ex-
cepted to the charge, and sued out a writ of error.

*A. D. Russell & J. Anthon*, for plaintiffs in error.

*T. R. Green*, for defendant in error.

*By the Court*, BRONSON, J.  Mercantile guaranties are not
often drawn up by men of the legal profession, and they are
so various in point of form, that almost every instrument of
the kind calls for a separate interpretation. But little light
can be derived from adjudged cases, and the courts have
sometimes found it necessary to inquire into the course of
trade, or the usage in a particular kind of business, for the
purpose of ascertaining the extent of liability for which the
parties intended to contract. Although the undertaking of
the defendant is not the most difficult of interpretation, there

is still room for a diversity of opinion about the legal effect of the instrument.

By this contract the defendant agreed that George C. Lamb, the auctioneer, should duly account with the plaintiffs, *first,* for all merchandize which they might place in his hands for sale within three months ; *second,* for the proceeds of that merchandize ; and *third,* that he should so account on demand. But the concluding clause of the instrument contains an important qualification of the undertaking—looking at which, in connection with the other facts proved on the trial, I think it evident that the parties contemplated, *first,* that the sales made by the auctioneer would, for the most part, be on credit ; *second,* that notes or other securities would be received by the auctioneer from the purchasers of the goods ; and *third,* that those notes and securities, either with or without the guaranty of the auctioneer, would be paid over or transferred to the plaintiffs. The undertaking of the defendant, then, amounted to this : that George C. Lamb should not convert the goods entrusted to him to any other purpose, but should fairly sell them at auction, according to the course of that business, or the agreement between him and the owners ; that he should take proper notes or other securities from the purchasers for all such goods as should be sold on credit ; and that those notes and securities should be paid over or transferred to the plaintiffs, together with the money which might be received on sales for cash. This was what the parties intended, and I think all they intended, by the agreement that George C. Lamb should duly account with the plaintiffs for all the merchandize and the proceeds of merchandize which they might place in his hands for sale. It was an undertaking for the good faith of the auctioneer in conducting the sales and receiving the securities, and that the proceeds of the merchandize, whether in security or money, should be paid over to the plaintiffs.

There is no complaint that the auctioneer acted improperly, either in conducting the sales, or in taking notes from the purchasers ; but he has neither transferred the notes to the plaintiffs, nor paid them in any other way for the goods ; and for

NEW-YORK,
May, 1836.

Colemard
v.
Lamb.

NEW-YORK,
May, 1836.

Colemard
v.
Lamb.

this default the defendant is clearly liable on his guaranty, unless he has been discharged by some act or omission on the part of the plaintiffs. The agreement of the defendant was, that the auctioneer should account " on demand." After each sale, and the lapse of a reasonable time for taking the paper of purchasers, the plaintiffs had the right to call on the auctioneer to account, and transfer to them the notes and other securities which he had received. But they could not substitute any new arrangement between themselves and the principal, without the peril of discharging the surety. The rule of law on this subject is so well settled that I shall only refer to a few of the cases, without stopping to point out their application, *Rathbone* v. *Warren*, 10 *Johns. R.* 587. *King* v. *Baldwin*, 17 *Johns. R.* 384. *Wright* v. *Johnson*, 8 *Wendell*, 512. *Huffman* v. *Hulbert*, 13 *Wendell*, 375. 2 *Paige*, 497. 3 *id.* 614. 4 *id.* 481. 5 *Barn. & Cres.* 269. 4 *Bing.* 464. Lamb, the auctioneer, rendered an account of each of the sales which he made to the plaintiffs; but he did not transfer to them the securities taken from purchasers; and so far as appears, he was never requested to do so. Instead of pursuing that course, the plaintiffs settled with him from time to time, and took his notes at three months, for the amount of the sales, after deducting commissions; and on each occasion they gave him a receipt in full. A new contract was thus made between the principal parties, without the consent of the surety, and one for which he had never agreed to be responsible. The arrangement was one which might not improbably prove prejudicial to the surety. It made the auctioneer, instead of the purchasers of the goods, the debtor of the plaintiffs; and it left the securities which had been taken from third persons in the hands and subject to the disposition of George C. Lamb. Had the plaintiffs pursued the course originally contemplated between them and the surety, it is probable that the auctioneer would have delivered over the notes; or, if he had refused to do so, the surety might have found means to indemnify himself against loss. George C. Lamb was then in good credit, and continued to meet all his engagements for about two months after his last settlement with the plaintiffs. But it is

unnecessary to speculate upon the consequences which were likely to result from the new agreement made with the principal. It is enough that a new arrangement, obligatory upon the parties to it, was actually made; and as this was done without the consent of the surety, there can be no doubt that he was discharged from all further liability.

It is contended, on the part of the plaintiffs, that if they cannot recover the whole, they are, at the least, entitled to the amount of the cash sales made by George C. Lamb. The witness *Drinker* testified, in general terms, that the plaintiffs' goods were sold " at the usual credit of six months ; " but he afterwards says, he thinks Lamb received cash for a part of the goods, and for a part received notes. *Hays*, another witness, says, that Lamb was " in the habit of getting cash " for all goods sold under one hundred dollars; and that a part of the plaintiffs' goods were sold for cash, and for a part notes were taken " at six months credit." How much was received by the auctioneer, without taking notes, does not clearly appear ; but it was only a small portion of the whole amount of sales. Although the defendant, in entering into this guaranty, evidently supposed that the sales would, in general, be made on credit, I think he was bound to see that the auctioneer accounted for the proceeds which came to his hands, in cash. It seems to have been the usual course of this business to sell on a credit of six months; but for small sums the purchaser was required to pay cash. Such, at all events, was shown to be " the habit" of George G. Lamb ; and it may be presumed that the defendant understood the mode in which the business of his son was usually conducted. The cash sales were not made in pursuance of any new directions from the plaintiffs ; and the defendant was answerable, under his contract, for those sales, either on the ground that the auctioneer acted improperly in making them, or because he neglected to account for the proceeds which in that form came to his hands. But the defendant has been discharged from that liability by the act of the plaintiffs. They do not complain that there was any thing wrong in requiring cash payments from those who purchased only a small

NEW-YORK,
May, 1836.

Colemard
v.
Lamb.

amount, nor indeed that there was any thing improper in obtaining cash to any extent; but their complaint is, that the money has not been paid over.   The undertaking of the defendant was that the auctioneer should account "on demand;" and I can perceive nothing in the nature of the case which precluded the plaintiffs from requiring an immediate account, after each sale.   Whether the proceeds were in notes or money, they might require that they should at once be placed in their hands.   But instead of doing so, they gave credit to the principal, and took his notes at three months, for the whole amount of sales.   There can be no doubt that such an act will discharge the surety.

The plaintiffs seek to avoid this consequence by setting up, on the argument, that the auctioneer *fraudulently* represented to them that all the goods had been sold on a credit of six months; and that they ought not to be concluded by accepting his notes, when they were not advised that there was any money in his hands.   The first answer to this argument is, that it does not appear that it was put forward on the trial. The plaintiffs there presented a claim amounting to five or six thousand dollars, and so far as appears, they made no suggestion that there was any principle applicable to a part, which was not equally applicable to the whole demand.   They did not then, as they do now, ask the court to decide that they were at least entitled to recover to the extent of the cash sales; nor did they set up this charge of fraud against the auctioneer.   Had they done so, it might, perhaps, have been answered on the spot, by proving that they were fully apprized of the fact that a part of the sales were made for cash. Parties have no right to present their case in one form at the circuit, and then place it upon a different ground in a court of review.   A bill of exceptions only draws in question those matters of law which were ruled against the party on the trial. When the judge charged the jury that the defendant was entitled to a verdict, the plaintiffs, if they thought there was any ground for this allegation of fraud, should have asked the judge to submit that question to the jury; and if he refused, an exception would have been the proper mode of testing the

legality of his opinion. It is against well established princi- <span>NEW-YORK,</span>
ples to permit a party to urge objections on the argument of a <span>May, 1836.</span>
bill of exceptions, which, if they had been presented on the <span>Colemard</span>
trial, might have been satisfactorily answered by the other <span>v.</span>
party. But there is, in truth, very little, if any, foundation <span>Lamb.</span>
for this allegation of fraud. The whole argument rests on
the fact that four of the five bills of sales rendered by the auc-
tioneer are marked at the top " 6 months, " or " 6 Ms." These
marks were probably intended to indicate that the sales had
*in general* been made on a credit of six months, and nothing
more. They do not necessarily mean that every article had
been sold on credit; and there is nothing in the case which
will warrant the inference that the auctioneer made any false
representation at the time the accounts were settled. If we
can resort to conjecture, it would not be unreasonable to pre-
sume that the plaintiffs fully understood that a part of the sales
had been made for cash. It was probably the course of this
business to require cash payments from those who only pur-
chased to a small amount ; and to accept cash from others,
who might be willing to pay, instead of giving notes. Such
was " the habit" of the auctioneer whom the plaintiffs em-
ployed; and it is not too much to suppose that they knew in
what manner the business was conducted.

The claims of the plaintiffs, so far as the surety is concern-
ed, must all share one fate. They probably did not intend that
any such consequence should follow, but the new agreement
with the principal has absolved the surety from all liability.

Judgment affirmed.